UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA        *       Case No. 24-MJ-00481(CLP)
                                *
                                *       Brooklyn, New York
                                *       September 6, 2024
        v.                      *
                                *
JACOB ISRAEL WALDEN,            *
                                *
              Defendant.        *
                                *
    *   *   *   *   *   *   *   *   *   *   *   *   *   *

    TRANSCRIPT OF CRIMINAL CAUSE FOR BOND REVOCATION HEARING
          BEFORE THE HONORABLE JOSEPH A. MARUTOLLO
             UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:             LEONID SANDLAR, ESQ.
                                Asst. United States Attorney
                                United States Attorney's Office
                                271 Cadman Plaza
                                Brooklyn, NY 11201


For the Defendant:              SAUL WARREN BIENENFELD, ESQ.
                                Bienenfeld Law
                                680 Central Avenue, Suite 108
                                Cedarhurst, NY  11516






Proceedings recorded by electronic sound recording,
transcript produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**Shelton, CT 06484 (203)732-6461**

2

1          (Proceedings commenced at 3:07 a.m.)

2          THE CLERK:  (Delay in start of audio) -- of bail

3     conditions, case no. 24-MJ-481, United States vs. Jacob

4     Walden.

5          Counsel, starting with the government, please state

6     your appearances.

7          MR. SANDLAR:  Good afternoon, Your Honor.  Leonid

8     Sandlar for the United States.

9          MR. BIENENFELD:  Saul Bienenfeld for Jacob Walden.

10    Good afternoon, Judge.

11         MS. CARLSON:   Amanda Carlson, for Pretrial

12    Services, standing in for Tara Sarnelli.

13         THE COURT:  Okay.  Good afternoon, everyone.

14    Please be seated.  And first, thanks for everyone's patience

15    as the last proceeding went a bit longer than expected.

16         So we're here today just to address some certain

17    issues of the conditions.

18         I guess let me start with the government and then

19    I'll ask Pretrial to speak on this and then I'll talk to the

20    defense counsel.

21         MR. SANDLAR:  Good afternoon, Your Honor.  Leonid

22    Sandlar for the United States.

23         Your Honor, we're here because Probation --

24    Pretrial Services submitted a memorandum outlining certain

25    concerns that they had with the defendant's conduct that

1    constituted violations, or potential violations, of his

2    conditions of release.

3            Since the memorandum came from Pretrial Services, I

4    was going to let Pretrial Services speak to the content of

5    the memorandum, Your Honor.

6            At this time the government does not seek detention

7    on the basis of the violations.  However, the government is

8    concerned by the contents of the memorandum and certainly

9    reserves the right, if you will, to do that in the future.

10           At this time, absent direction otherwise from Your

11   Honor, I would turn it over to Pretrial Services.

12           THE COURT:  Yes.  And I have reviewed the

13   memorandum and I am thinking about remand right now, given

14   the egregiousness of these violations, but let me hear from

15   Pretrial.

16           MS. CARLSON:  Good afternoon, Your Honor.  Thank

17   you.

18           So as Your Honor stated, the memo did detail some

19   of the (indiscernible) here regarding the defendant's bail

20   conditions.

21           The first concern it names is that the defendant

22   made an unauthorized stop at a Verizon Wireless store for a

23   few moments.

24           Our concern with that is number one that -- is

25   failure to abide by his home detention condition and number

4

1    two, obviously, being at a Verizon store even for a short

2    amount of minutes, we're unsure what the defendant did during

3    that time frame, if there was access to unauthorized devices

4    during that time frame.

5            The second issue involves a review of cyber

6    monitoring data that shows the defendant using what's called

7    Smart Switch, which is an application that you can use to

8    transfer iPhone data to an Android.  Being asked the

9    defendant was instructed to purchase an Android in order to

10   be compatible with our cyber monitoring software.

11           He did that and from what I understand he attempted

12   to transfer his data from his previous iPhone to his Android,

13   which is acceptable.

14           However, the issue here is the screen shots show

15   that there were a QR code, a scannable QR code that came up

16   on the cyber monitoring software that indicates another phone

17   was either used to scan that QR code or to be connected via

18   cable to that Android in order to switch the data from the

19   iPhone to the Android.

20           It is our understanding that defense counsel is in

21   possession of the defendant's previous iPhone, but the screen

22   shots here indicate that there may be another device that the

23   defendant has access to, which is, of course, of concern to

24   our office.

25           The second issue with the cyber monitoring software

5

1      is the conversations on WhatsApp that regarded sexual acts in

2      exchange for money.

3              The other issue with that is that Voicenotes were

4      mentioned.  The quote exactly was should I not be typing this

5      only VN, which we could infer means Voicenote.

6              The issue with that is our cyber monitoring does

7      not have the capabilities to pick up the audio of a

8      Voicenote, so the implication that something should be done

9      via VoiceNote, as opposed to written message shows a way of

10     potentially circumventing the software.

11             So aside from the discussion of potential sexual

12     acts in exchange for money, the mention of Voicenotes is of

13     concern to our office.

14             And lastly we're really seeking some guidance from

15     the court in terms of the defendant's employment.  The reason

16     for that is the cyber conditions involve us monitoring cyber

17     activity from the defendant, not only in his home personally

18     but also when he is at his place of employment.

19             The unique aspect of this case with this defendant

20     is that he is a part owner of his business.  So in a normal

21     situation where someone is an employee of an office, they

22     usually are provided with some sort of internet policy that

23     states they can only use their internet at work for work

24     purposes, not personal reasons or any nefarious activity.

25             The concern here is that the defendant is a part

1    owner and could potentially create, edit, change, alter any

2    of those rules.

3            So we did conduct an employment visit. We did ask

4    the defendant's business partner if he would be willing to

5    allow us access to the company's router. He was not

6    comfortable with that.  We can understand that, obviously.

7            The defendant's partner is not on supervision and

8    might potentially not want us intervening on his internet

9    use.  So we are trying to be creative in terms of obtaining a

10   contract or some sort of policy or an affidavit from the

11   defendant's partner to show that his internet is being

12   monitored in some sort of way. However, that has not been

13   obtained.

14           We have been given some documentation from defense

15   counsel about cyber policies. However, the policies, in our

16   opinion, are incomplete.  The policies look as if they could

17   have been Googled and snap shoted from Google and put on the

18   defendant's company letterhead and given to us, which is why

19   we requested the signed affidavit from his partner assuring

20   that he's not going to use more than the monitored devices

21   that we know about.

22           For clarification, he does have a monitored cell

23   phone and he does have a monitored laptop that he has been

24   using for some remote work right now.

25           So at this time we're not comfortable with allowing

1    him to be in the office five days a week where we know he has

2    access to other internet capable devices.  We are trying to

3    be creative in terms of ways to get around that while still

4    monitoring these conditions.

5              However, we're not comfortable with any of the

6    avenues that we've been provided at this time.

7              THE COURT:  All right.  Thank you for that.

8              Let me hear from defense counsel.

9              MR. BIENENFELD:  Thank you, Judge.  Good afternoon.

10             There's a lot of confusion and misunderstanding and

11   I hope to explain everything and be clear about everything.

12             I do want to say that at no time did my client ever

13   violate any of his conditions.

14             The memo submitted by Pretrial Services probably

15   has a typo because it says that on August 6th he's seen at

16   Verizon. He had permission on August 6th.

17             There is an email from Pretrial Services, August

18   6th, 2024 at 10:01 a.m. that just asks me to confirm the time

19   that we should meet at Verizon and I said we would meet there

20   at 2 o'clock.

21             But I think that they're making a mistake. I think

22   they meant August 5th.  So I want to clarify what happened on

23   August 5th, if I may, Judge.

24             If the judge wants to see the email, I certainly

25   have copies for the court.  For everything that I'm talking

8

1    about I have copies for.

2              On August 5th --

3              THE COURT:  Well, let me ask Pretrial Services,

4    what's the story there on that first point?

5              MS. CARLSON:  I'm reviewing the notes, Your Honor,

6    just so that we can be --

7              THE COURT:  And I appreciate it. Just for the

8    record, Pretrial -- I think, Tara Sarnelli is the Pretrial

9    Services officer who wrote this report.  And Amanda is here

10   today.  Amanda Carlson, sorry.

11             MS. CARLSON:  Yes.  Thank you, Your Honor.

12             I'm looking quickly, but it does look like defense

13   counsel is right.  He was -- on 8/6 he was given permission

14   to go to Verizon, but on 8/5 is the day that we are referring

15   to as the unauthorized stop.  So that is a typo.  Defense

16   counsel is accurate.

17             THE COURT:  Okay.  So then -- so in light of that,

18   since he was permitted to go on August 6th, but he was there

19   on August 5th, what's the response from the plaintiff?

20             MR. BIENENFELD:  So what happened on August 5th is

21   as follows.

22             He was in court because they had a problem with his

23   ankle monitor.  He had the problem straightened out and then

24   there's confusion in terms of what to do next, because he

25   said I have to get my number ported, but my attorney has my

9

1    old phone. So they said oh, just have him send an email

2    requesting that you go to Verizon.

3         So I said okay, and this is me. I'm saying to my

4    client, okay, meet me at the Verizon store. I will bring your

5    phone and as soon as we get permission we'll go into the

6    store.

7         He's in the parking lot of Verizon. I send an email

8    on August 5th at 6:22 p.m.  The email says I'd like to meet

9    my client at Verizon on Rockaway Turnpike in Lawrence, New

10   York to switch his phone number to the new phone.  They close

11   at 7:00 p.m.  Okay.

12        My client pulls into the parking lot. I had to go

13   into his car and we sit and talk for about ten, 15 minutes. I

14   then say gee, I didn't get a response back from them.  Let me

15   see what's going on.

16        And I look at my phone and I see very nicely in

17   red, okay -- I can definitely give this to the court.  It

18   says emails received after 4:00 p.m. will be considered as

19   received the following business day.

20        So I said listen, we're not going to be able to do

21   this now.  You go home. I'm going to keep your phone. I'll

22   ask them in Verizon how to get it done and I'll let you know

23   once we get permission.

24        So I walk into Verizon. I ask them how it gets

25   done.  They tell me come back with the phone and the next day

1    I say, okay, we have permission to come at 2:00 p.m.

2            We show up at 2:00 p.m.  He forgets his license --

3            I think you forgot you license at home.  Is that

4    it?

5            He forgot his license at home, so literally my

6    office and his house is ten minutes from the Verizon store,

7    maybe less probably.

8            He goes home.  Gets his license, comes back.  All

9    this could be seen on the monitor.

10            We sit with the Verizon people for about an hour

11   and a half and we can't get this done.  We just can't get it

12   transferred.  They say look, you need a special peck and

13   Verizon, go home and call them.  Great.

14            So he goes home, he calls them, and he says okay,

15   there's something called Smart Switch, but you need to bring

16   my phone back to me because I need to get certain codes from

17   the phone in order to switch it back and all the apps.  So I

18   said fine. I'll come at night.

19            So I came that first night.  The next day I come,

20   right --

21            THE COURT:  Well, let me just interrupt though.

22            I mean, in the report it says that during the

23   office visit the defendant requested a stop at a Verizon

24   Wireless store of the undersigned, and that refers to Officer

25   Sarnelli, denied the request and instructed him to submit a

1    detailed request for review.

2         So did that happen?  Was there a detailed request

3    for review?  I mean, I appreciate that he sent an email and

4    you coming back but --

5         MR. BIENENFELD:  I don't even know what a detailed

6    request for review means. All I know is that there was

7    probably a miscommunication because he told me all -- he told

8    me, he said, Saul, my first name, all you need to do is send

9    them an email and as soon as they approve it, we can walk

10   into the store.

11        So I said, great, let's meet at the store. I'll

12   send them an email.

13        So I don't know what a detailed request for review

14   is but I think what it might mean -- is because in her email

15   to me, right, where she gives me permission to go to Verizon

16   and she says that she needs the documentation from Verizon

17   that the number was changed over and that she's going to need

18   the two emails, the passwords, the therapist contact

19   information and a list of all internet capable devices in the

20   residence, which she was provided with all that stuff.

21        So maybe she's referring to that, because that's in

22   the email that gives me permission to go to Verizon.

23        THE COURT:  Well, let me just hear from Pretrial

24   Services.

25        MS. CARLSON:  Yes, Your Honor.

1        So on August 5th the defendant did report to the

2    office and met with Officer Sarnelli.  Then later on that

3    evening the defendant's attorney sent us an email at 6:22

4    p.m. asking to meet with his client at Verizon Wireless and

5    said that they close at 7:00 p.m.

6        So being as this email was received by our office

7    at 6:22 p.m. on the night of 8/5, we did not respond to that

8    email to provide the defendant permission to attend the

9    Verizon Wireless store before 7:00 p.m. that night.

10        So that's the email I assume he's referring to as

11    requesting permission.  That was not responded to that

12    evening, therefore, he did not have permission to be there

13    that evening.

14        THE COURT:  I mean, it doesn't --

15        MR. BIENENFELD:  I can give you more background to

16    this as well.

17        THE COURT:  I mean, it seems pretty straight

18    forward to me that there wasn't permission given and he was

19    there, right?  So I appreciate that a request was made but

20    why don't you move onto the next violation then, or the

21    potential violation.

22        MR. BIENENFELD:  So then what happens is we can't -

23    - we can download all the apps except for WhatsApp.  It won't

24    download.  We spent a couple of hours trying to figure it out

25    and then I realized, you know what?  They probably didn't

1    turn on permission for WhatsApp. So we asked for permission

2    to turn on WhatsApp.  It gets -- they claim that it was

3    turned on.

4         So I go back to his house with his other phone the

5    next -- it's Thursday night into Friday morning.  I was there

6    until 3 o'clock in the morning.  We were dealing with the

7    phone and we were dealing with the legal issue that's at

8    hand.  And I was dealing with his family.  His family came

9    over.  They wanted to be reassured that everything would be

10   okay.  I was talking to his brother. I met with his mother. I

11   was talking to his wife.  Everyone was there.  So it was a

12   whole night affair.  And that's why you'll see the other QR

13   codes as well.

14        So I hope that clears up the Verizon issue and if

15   you have any questions, I certainly can answer them.

16        THE COURT:  Candidly, it doesn't.  I mean, it

17   clears it up in the sense that there's an explanation but I

18   mean, at bottom it still strikes me that I consider that a

19   violation of his conditions.

20        And then the second point -- you know, I appreciate

21   that there's this further confusion about the QR code, but,

22   again, it doesn't seem like anything is inconsistent with --

23   apart from the date being incorrect on August 6th, and the

24   report should have been August 5th, I don't hear anything, at

25   least right now, that indicates that there's actually

1    anything incorrect about this Pretrial report.

2          MR. BIENENFELD:  Well, the only thing that's

3    incorrect is that the date, first of all, but he was told --

4    -- once he -- what happens is he had to buy a phone, leave it

5    at Pretrial Services so they could put their software on it,

6    right.  Come back, pick up the phone and when he picked up

7    the phone he says now I have to go and port the number. And

8    he believes he was told okay, go to Verizon and port the

9    number.  But you need your attorney to get permission.

10         So I figured, okay, I'll get permission. I didn't

11   know at that point -- this is the five days after arraignment

12   that it's a 24 to 48 hour process.  I didn't know that, quite

13   frankly.

14         So I said fine. I'll send the email and get

15   permission but we didn't get permission so we didn't go into

16   the store.

17         So he was told that he could go to Verizon to port

18   the number, and he should go to Verizon to port the number.

19   They actually wanted him to have only one number.  All right.

20   That he should go to Verizon.

21         And now Officer Sarnelli's saying I never said

22   that.  And I understand that she's said I never said that.

23   But his view was go, but you need permission, so have your

24   attorney write me an email.  All right.  And that's where the

25   confusion I think is.

15

1          THE COURT:  So let's move on to the August 16th --

2          MR. BIENENFELD:  Okay.  So August 16th, all right,

3   I have an affidavit.  It is not notarized because the person

4   that signed it lives in Florida and I only had like 12 hours

5   notice to get this done.

6          I have a redacted version and a regular version for

7   the court to see.  Okay.  This is from the person -- her

8   name, I'm going to call her BB in the court. I don't want to

9   give her name.  But it is in the affidavit that is

10  unredacted.

11         She is a recovering sexaholic, much like my client.

12  They met in recovery.  My client was alone that weekend and

13  reached out to her for recovery purposes.  Only for recovery

14  purposes.

15         And he said I'd like you to come over and spend

16  time with me.  And she said I can't come over to spend time

17  with you but I'm so concerned about you that I will send a

18  friend over.

19         And he said great, I'll pay the friend $500 to come

20  over. I'm so desperate for company.

21         But there was nothing in those emails, and I took a

22  look at it, there's nothing there that suggests that there's

23  money in exchange for sex.

24         Now BB is --

25         THE COURT:  What about --

1          MR. BIENENFELD:  -- 31 years old.

2          THE COURT:  I'm sorry.  What about -- didn't you

3     just say -- I'm sorry.  You said a few moments ago about

4     $500.  Can you repeat that?

5          MR. BIENENFELD:  Yes.  So he offered whoever he's

6     going to send over $500 to spend time with him.  Not for sex,

7     to spend time with him because it's a Friday night.  It's

8     inconveniencing somebody so you could come over.  And I'll

9     pay you $500 to spend time with me.  Nothing -- there's no

10    conversation there about sex.

11         MS. CARLSON:  Your Honor, if I may?

12         THE COURT:  Yes.

13         MS. CARLSON:  I do have a screen shot of the

14    conversation that I did provide to the U.S. Attorney's Office

15    and to defense counsel if you would like to review it.

16         THE COURT:  Yes, I would. I'm sorry, defense

17    counsel.  I know I cut you off.

18         MR. BIENENFELD:  So I also have an affidavit from

19    BB, okay, and I can provide that both redacted and unredacted

20    format as well.

21         But it basically says who she is, what her phone

22    number is. That she's 31 years old.  That she knows Mr.

23    Walden as Jake for the past five years.  That they met in the

24    rooms of Sexaholics Anonymous and they're recovery friends

25    ever since.

17

1        And that on August 16th he reached out to her via

2   WhatsApp for recovery purposes. He was feeling lonely and

3   sad.  He offered to pay me to come over to his house and keep

4   him company. I would never take money from a friend for such

5   a reason.

6        Additionally, there was no discussion about sex in

7   exchange for money.  At Sexaholics we sometimes use dark

8   humor and joke about such things but Jake never offered money

9   in exchange for anything sexual.

10       I was not able to come over, but I understood that

11  a fellow recovering addict was in a tremendous amount of pain

12  and I did not want him to be alone that evening.

13       I therefore offered to ask my friends if they would

14  stay with him to keep him company.  My friends are over the

15  age of 30.

16       They agreed and I was informed they had a good time

17  and no sexual activity took place.

18       I'm signing this affidavit of my own free will and

19  I will not -- I was not offered anything in exchange for

20  doing so. I only ask that the court keep this information

21  confidential as I do not want my name and phone number in any

22  public records.

23       And she signed it and I did not get it notarized

24  because of the time frame.

25       THE COURT:  All right.  Any further response?  And

18

1    also just for the record I'm looking into the documents that

2    are screen shots provided from Pretrial Services from August

3    16th.

4             And just to be clear, these screen shots, whose

5    text from these screen shots right here?

6             MS. CARLSON:  The white screen shots are from

7    Bracca, if that's how you pronounce her name.

8             MR. BIENENFELD:  BB.

9             THE COURT:  BB.  Okay.

10            So the white screen shots -- I'm just looking on

11   here on this printed out screen shot that was referenced in

12   the Pretrial memo about should I not be typing this only VN.

13   After that she allegedly says at 7:10 p.m. should I give her

14   your number.  She said she's down to come.  I told her you'd

15   give her $500, LOL.

16            She wants to know if she can come with her friend

17   too, another girl, and there's also a comment about if she's

18   hooked up with married guys before.  And yeah, just don't

19   pressure her into anything.  She has her own sexual trauma.

20   Let her decide what she wants to do, especially I don't know

21   if she's hooked up with married guys before.

22            Okay.  So I just want to note that for the record.

23            Anything further about this incident on August

24   16th?

25            MR. BIENENFELD:  Just that this was totally

1    recovery related. He was alone. At that time he did not have

2    permission --

3             THE COURT:  When you say recovery related --

4             MR. BIENENFELD:  Recovery related.  It was --

5             THE COURT:  It was loneliness.  That's the issue

6    here not --

7             MR. BIENENFELD:  Loneliness is --

8             THE COURT:  -- sexual activity.

9             MR. BIENENFELD:  -- the biggest enemy of an addict.

10   It is the biggest enemy of an addict.  It is the worst thing

11   for an addict to be alone.  They say it's called HALT.  I

12   think it's hungry, angry, lonely and tired.  And people who

13   are addicts and know that they're addicts and feel lonely,

14   they go ahead and they reach out for company and they speak

15   to other addicts so that they won't be alone, so they don't

16   act out.

17            THE COURT:  And just so I understand it, for the

18   record, the defendant's position here today is that this

19   exchange on August 16th was merely another person coming --

20   or two other women coming to his home to give company and

21   money was exchanged purely for physically being there and no

22   sexual activity occurred.

23            MR. BIENENFELD:  I don't even know if money was

24   ever exchanged with them.  It is certainly I think -- he

25   asked for it, but I don't know if it was exchanged.

1          But you should also note at this time that he

2     didn't have any access to Uber Eats or to those apps where

3     you could buy food.

4          THE COURT:  So you're telling me that this text

5     exchange is about food?

6          MR. BIENENFELD:  No, not at all. I'm just telling

7     you that he couldn't even get food at that point.  So, you

8     know, you're lonely and you're hungry. I'm just saying --

9          THE COURT:  Okay.  All right.  And let's hear about

10    the issue with defendant's employment and the internet access

11    there at Emerald Health Care.

12         MR. BIENENFELD:  Okay.  So he works for a company

13    called Emerald Health Care.

14         I had provided them with the contract from a

15    company called Global Tech Solutions.  It is a contract that

16    -- I have a copy for the court. I provided them with every

17    device at the office. Okay.

18         And the contract is for cyber monitoring and I have

19    a separate email from an Akeva (ph) Ezzatopour, I'll spell if

20    for the record, E-Z-Z-A-T-O-P-O-U-R, who is the vice

21    president of Global Tech Solutions, and he says I'm attaching

22    a copy of what we block, okay.

23         And he writes Global Tech Solutions employs

24    something called Sonic Wall content filtering for Emerald

25    HCM.  The following categories are blocked.

21

1          And among them are drugs, illegal drugs,

2    pornography, sex education, intimate apparel, swimsuits,

3    something called grogs (ph), nudism, alcohol, tobacco, adult

4    material content, everything that Pretrial Services would

5    want blocked is blocked.  And they're not satisfied with

6    that.

7          There is a system in place to block all this

8    content already and they're satisfied with it.

9          THE COURT:  What is the web monitoring that's in

10   place?

11         MR. BIENENFELD:  Sonic Wall it's called. And by the

12   way, they know Sonic Wall's in place because when they took

13   his laptop to put their own software on it, they couldn't do

14   it.  He had to turn off Sonic Wall in order to do it.  So

15   that took another two, three days in order for him to get his

16   laptop back because they know it's in place.  It's such a

17   powerful thing that they couldn't even put their own software

18   on it.

19         To ask someone's business partner to be a

20   babysitter is not proper. It's not proper for him to sign an

21   affidavit that states -- and here's what they want him to

22   sign.  They want him to sign saying this:  Mr. Walden will

23   not access any other internet capable devices while at work

24   other than his monitored laptop and cell phone.

25         How could it -- I mean think about a law firm.  If

1    there's two lawyers in two different offices, how could one

2    monitor the other?  It's impossible.  How could you possibly

3    expect a business partner to sign something like that?

4            It has been over a month since he's been to the

5    office physically.  The place is in -- I'm not saying

6    shambles, but the place needs leadership.  And he needs to be

7    there, okay?

8            I have asked many times --

9            THE COURT:  When you say he hasn't been there, --

10           MR. BIENENFELD:  He hasn't physically been in the

11   office.  There's 15 employees?  There's 15 in the New York

12   office.  There's 3,000 employees for Emerald Health Care.

13   There's 15 in the New York office, all right?  The New York

14   office is literally five minutes from his house, okay?

15           The judge at arraignment said stationary employment

16   is approved.  He can go ahead and work there.  Everyone else

17   on monitoring is allowed to go to work.  They're denying him

18   access when they have proof that -- and I can hand it up to

19   the court, they have proof that all the monitoring is taking

20   place. They have the contract and they have the proof from

21   the vice president that the monitoring is taking place.

22           I cannot get the partner to sign a letter that says

23   he's in charge of babysitting him.  It's not going to happen.

24   It's not even fair to ask it, Judge.

25           THE COURT:  Let me hear from Pretrial on that last

1    point.  And also if -- from Pretrial's perspective, just to

2    confirm whether the defendant has actually physically been to

3    his employer.

4           MS. CARLSON:  Your Honor, he has not physically

5    been to his employer.  He has -- as I stated earlier he does

6    have a laptop that is monitored that was returned to him that

7    we understand, and we can see from our cyber review that he

8    is working remotely in some capacity.

9           We, of course, understand that he would like to be

10   in the office, being as he is part owner of this business and

11   we are not denying him to ever return to the employer.

12   However, we were charged with monitoring his internet use.

13          And as stated in this memo we already have some

14   concerns about unauthorized devices and his internet use.

15          The policies that defense counsel is referring to

16   that he has submitted to us were denied in part because one

17   of them was incomplete.  It was only pages 16 through 18 of a

18   policy, not the complete policy.

19          The other that he is referring to in terms of

20   what's blocked on their network, it looks like it could

21   potentially just have been a snippet of a screen from

22   anywhere.  It doesn't appear to be what a normal policy from

23   an employer, in terms of internet policy would look like.

24          We did ask the employer for access, as I stated

25   earlier, to the router, which he was not comfortable doing.

1    We understand that he's not under supervision, so we're

2    trying to be creative in terms of obtaining that affidavit

3    from him.

4         Frankly, the way that the conditions are worded say

5    that we can monitor any internet access that he has at his

6    place of business, a privately owned business, or within his

7    personal home.

8         We don't think it's reasonable to go into his place

9    of work and monitor 15 employee -- you know, employee

10    devices.  So we're trying to be reasonable here while also

11    monitoring the conditions that the court has charged us with,

12    which is why we asked for that affidavit in order to have

13    further assurance that he is not using other devices.

14         MR. BIENENFELD:  Can I hand up the exhibits --

15         THE COURT:  Sure.

16         MR. BIENENFELD:  -- regarding the monitoring.

17         THE COURT:  And I have some thoughts here too.  But

18    I do want to also hear from the government in response.  But

19    I'm sorry.  Pretrial did you have anything further on that

20    point?

21         MS. CARLSON:  No, Your Honor.

22         THE COURT:  Okay.  Let me hear from the government.

23         MR. BIENENFELD:  I just want to clear what I handed

24    up.

25         THE COURT:  Go ahead.

1          MR. BIENENFELD:  I'm sorry, Judge.

2          So you have the email from the vice president and

3     there's an attachment to it.  So I printed out the attachment

4     that they're saying is just a screen shot. It's not just a

5     screen shot. It's on the Global Tech letterhead, okay, and he

6     writes that they're monitoring those devices -- they're

7     filtering and what the filter is, the Sonic Wall, and what

8     devices have a check mark is what's being filtered.

9          And you can see there's a whole bunch of stuff,

10    including pornography and nudity. Okay.

11         And then you have the contract, and contract is a

12    self-renewing contract.  So I handed that up as well.  And

13    you have a list of all the devices. I handed that up as well.

14    Those are the three things they asked for except -- in

15    addition to a notarized letter.

16         THE COURT:  How does it work in terms of using, I

17    guess, a company laptop but on --

18         MR. BIENENFELD:  They were all password protected

19    and the policy is you can't use someone else's laptop.  But

20    everyone has their own password on their laptop.

21         THE COURT:  And what about the home internet usage?

22    Is there any -- and I'm not as familiar with this as others,

23    but if you're on your home network, does that give you

24    certain benefits that you may not have on a company network

25    if you're physically in the office?  Is there any

26

1    understanding of that?

2            MR. BIENENFELD:  Yes.  Because this is a nursing

3    care business, there's a lot of HIPAA regulations involved in

4    this.

5            So there are certain things that could only stay on

6    the computers in the office.  Servers.  That's the word.  You

7    can't get -- anyone can't just get onto it.  So he can't from

8    his house get onto the servers because of HIPAA violations.

9    It would be a HIPAA violation.  All right.

10           And you have patient records there and you have

11   other records.  You have to be in the office on that server

12   in order to see certain documents.

13           And for over a month he hasn't been able to do this

14   work because of this.

15           THE COURT:  How has he not been able to do his

16   work?  I mean, doesn't he have remote access?

17           MR. BIENENFELD:  Remote access does not work the

18   same when it comes to these HIPAA insured documents.

19           But additionally, Judge, face-to-face time is so

20   much more important. I know that we went through a pandemic -

21   -

22           THE COURT:  And just to be clear, what's preventing

23   him at this point -- just so I understand where things stand

24   right now.  What's preventing him right now on Monday from

25   going to the office?

1          MR. BIENENFELD:  He'll get violated.  We'll be back

2     here Tuesday.

3          THE COURT:  Yeah, but isn't -- correct me if I'm

4     wrong, but I believe under the -- Judge Bulsara's order,

5     right, he can go to the employer, right?  So what -- let me

6     hear from Pretrial on that.

7          MS. CARLSON:  Yes, that's correct, Your Honor.  He

8     does have permission to be at his work.  However, we have not

9     given him that permission because of the issue surrounding

10    whether or not we're able to monitor his internet effectively

11    --

12         THE COURT:  Monitor the computer.

13         MS. CARLSON:  -- at his employer.

14         THE COURT:  Okay.  Let me hear from the government.

15         MR. SANDLAR:  Yes, Your Honor.

16         As you can see from the discussion, I think there's

17    a certain lack of trust perhaps that has arisen between the

18    defendant and Pretrial.  In an ordinary case I think that

19    lack of trust could be overcome by a record of compliance, in

20    which case Pretrial usually is quite reasonable in making

21    accommodations.

22         I'm not sure, Your Honor, would agree to this, but

23    I wonder whether it would be useful to have another status

24    conference a week or two weeks from now to give Pretrial and

25    defense counsel, defendant, the opportunity to work out some

28

1    of these -- an impasse that I think it's maybe possible to

2    overcome.

3            THE COURT:  Well, I -- let me tell you what I'm

4    thinking and candidly, I did review the transcript.  And

5    Judge Bulsara did say very clearly if you violate a

6    condition, I, or another judge, could issue an arrest warrant

7    for your arrest.  And that could lead to you being held

8    without bail for the rest of your case.

9            So I really want to emphasize that to the defendant

10   here, because this is not a joke, right?  I mean, if there

11   are violations of the conditions, you will be held in

12   detention.

13           Hang on a second.

14           At this point I think there have been multiple

15   violations.  My view, looking at this as I can under the Bail

16   Reform Act, I'm not going to detain you today, but I am going

17   to change some of the conditions, because some of these I

18   think are egregious.

19           Frankly, the discussion about what occurred on

20   August 16th seems to me to be -- it strikes me as fanciful

21   and I still am not convinced -- I appreciate that counsel got

22   an affidavit, but it's from an unidentified individual and

23   ultimately, as Pretrial noted, there's no way at this point

24   to confirm the ages of those two unknown females who came

25   there.

1    I appreciate that there are addiction issues at

2    play here, but that does not excuse what -- you know, all

3    evidence would seem to me to point to sexual acts in exchange

4    for money, which would be, you know, quite absurd given the

5    very serious underlying allegations here.

6    I mean, keep in mind, this is a case that

7    implicates the Adam Walsh Act. There's child pornography

8    images. This is a serious case and I really have to consider

9    the danger to the community that the defendant holds.

10    So I'm going to make a few changes to the

11    conditions.  One --

12    MR. BIENENFELD:  Sure.

13    THE COURT:  I'm sorry. Go ahead.

14    MR. BIENENFELD:  I'm sorry to interrupt and I

15    appreciate you're going to make some changes.  But I just

16    want to point out that under 18 USC 3142, what the defendant

17    is charged with is not even part of C14 that says what he

18    would be excluded from.

19    There's --

20    THE COURT:  No, but the nature and seriousness of

21    the danger to any person or of the community, if the

22    defendant is released, is part of that assessment.

23    MR. BIENENFELD:  I understand.  But he's charged

24    with 2252(a)(4)(B), which is not in that list.  They

25    specifically removed that from the list to be part of the

1   Adam Walsh and the monitoring. It's not even there.

2           Now I understand you have full discretion of this

3   but it's not according to the law.

4           THE COURT:  Well, he is charged with serious child

5   pornography claims here, right? I mean, so this is --

6           MR. BIENENFELD:  And what he's charged with is not

7   part of 18 USC 3142(c)(4)(B).  It's not part of it. It's

8   excluded.

9           THE COURT:  Look, the conditions that Judge Bulsara

10  set remain, but you're correct in that this court does have

11  discretion to modify those conditions or hold the defendant

12  in detention if those conditions are violated.

13          In my view, there have been at least three to four

14  violations. I think the --

15          MR. BIENENFELD:  Judge, there's no proof --

16          THE COURT:  Well, again, I'd ask you stop

17  interrupting me, one.  And then two, I found, in my view,

18  that there are these violations based on the evidence

19  presented to me by Pretrial and based on our discussion

20  today.  So these are the condition changes I'm going to be

21  making.

22          One, the defendant shall not have any contact or

23  association with any individual under the age of 18,

24  including his own children, except when the minor's in the

25  presence of another adult, who's the parent or legal guardian

1    of the minor.

2            So that's a change from the prior conditions that

3    did not apply to him or his child.

4            So in other words, when he's with his children,

5    another adult needs to be present, based on these violations

6    and conditions.

7            Second, I am going to order that, as discussed with

8    Pretrial, there be a condition placed on restrictions on

9    visitors to his residence.

10           So no visitor should be permitted to go to his

11   residence, except for immediate family, parents, siblings,

12   children, cousins, unless pre-approved by Pretrial Services

13   or the court.

14           And then the third change I'll make in terms of the

15   conditions is that he should continue working remotely until

16   further order of the court, because I agree that it's not

17   clear -- I appreciate that there have been some documents

18   that were provided to me this afternoon, but telework remains

19   possible.  His business partner is currently not comfortable

20   providing the requested information.

21           And I do want to give more time for the parties to

22   try to work this out. So I'm going to change -- amend the

23   conditions slightly. I am going to schedule another hearing

24   date and that could be -- you know, we can see where things

25   are.  Defense counsel can revisit these conditions at that

1   point, and you know, if there's compliance and Pretrial's on

2   board.

3           So I'd like to schedule it for -- I can schedule it

4   for two weeks from today, if that works.

5           THE CLERK:  September 20th.

6           THE COURT:  Yes.

7           MR. BIENENFELD:  Could we do it in the morning?

8           THE CLERK:  At 11:00?

9           THE COURT:  And I could just ask if Pretrial -- if

10  you could just update the conditions --

11          MR. BIENENFELD:  Judge, he has no control over who

12  comes to his house.  He has a wife and kids there, okay.

13  It's impossible -- unless you're going to allow him to move

14  to another house, it's impossible for him to control these

15  things.

16          Additionally --

17          THE COURT:  I don't understand how that's possible.

18  I mean, he lives in a house --

19          MR. BIENENFELD:  There's five kids at home.

20          THE COURT:  He has five kids. Who else lives in the

21  home?

22          MR. BIENENFELD:  His wife, five kids and the

23  housekeeper comes up once in a while.

24          THE COURT:  And, look, again, unless pre-approved

25  by Pretrial Services, I'm not going to allow any visitors to

1    the residence.

2              We have a situation where there are two females --

3    I'm not sure of their age. No one -- you've indicated that

4    one said they're in the 30's.  I don't know their age.  There

5    are two individuals who came to their home.

6              In my view, the evidence suggests that this was

7    something related for a sexual act in exchange for money. I'm

8    not comfortable leaving the five children alone with the

9    defendant right now, given the circumstances and I'm not

10   comfortable just allowing the defendant to invite whoever he

11   wants.

12             If there's a need for someone for his employment or

13   another friend or something like that, he can go with

14   Pretrial Services.  I'll otherwise allow an exception

15   automatically for parents, siblings and children.

16             So if a cousin comes over unexpected, that's fine.

17   He doesn't need to check with Pretrial Services.

18             MR. BIENENFELD:  What about his attorney?  What

19   about his rabbi?

20             THE COURT:  I'll allow for -- I mean, the attorney

21   is fine.

22             MR. BIENENFELD:  Clergy.

23             THE COURT:  Clergy is fine.  So I'll add that in

24   there as well.  And obviously, Pretrial Services will be

25   reasonable.  And I just said, if there is someone from his

1    employment that needs to come over, you know, his partner or

2    this other individual that was being discussed, his business

3    partner, you know, I'm not going to deny that.

4              But at least at this stage, you know, the options

5    here are becoming more and more limited because -- and what I

6    consider, there to be multiple violations.

7              MR. BIENENFELD:  What about recovery people?

8              THE COURT:  Well, again, I'm not sure what that

9    means exactly, but if there's some --

10             MR. BIENENFELD:  People in Alcoholics Anonymous and

11   people in Sexaholics Anonymous --

12             THE COURT:  Well --

13             MR. BIENENFELD:  These meetings take place in his

14   house.

15             THE COURT:  Well, he can get approval from Pretrial

16   Services. If there's going to be a large meeting at his house

17   of Sexaholic Anonymous, he can get approval first from

18   Pretrial Services, just as he will with anyone else in terms

19   of providing, you know, information about the whereabouts.

20             I mean, I just don't want a situation in which I am

21   -- there's a hearing two weeks from now and BB, who

22   apparently is in Sexaholics Anonymous, is coming over and

23   it's now part of a meeting.  That --

24             MR. BIENENFELD:  Well, she lives in Florida now.

25             THE COURT:  That's fine.  Again, he can have

1    visitors. I said he doesn't need to get approval for parents,

2    siblings, children.  We'll add clergy and we'll add lawyer,

3    and co-workers from his current employment.

4              But everyone else should get approved from Pretrial

5    Services, or the court.

6              Mr. BIENENFELD:  Now, Your Honor, Pretrial Services

7    is, for lack of a better word, upset with how many requests

8    I've been making.

9              So now you're asking me to make even more requests

10   on them.

11             THE COURT:  I don't think Pretrial Services is

12   upset with the requests that -- this is part of their role.

13   This is a case where there's serious challenges --

14             MR. BIENENFELD:  They've actually said that, Judge,

15   that we're making too many requests.

16             THE COURT:  Look.  Pretrial Services -- I'll let

17   Pretrial Services respond, but I almost know the answer

18   already.  But I'll go ahead and let Pretrial Services

19   respond.

20             MS. CARLSON:  Thank you, Your Honor.

21             It's not that Pretrial Services is upset with the

22   requests that are being made. However, the defendant is on

23   home detention, which is a strict condition and we do have

24   protocol in place, including that requests are to be made 48

25   hours in advance with details to our office.

36

1          We do have multiple defendants on location

2     monitoring who are also making requests.  Therefore, we

3     cannot respond immediately to a request that's being made,

4     which is what the defense counsel here may be referring to.

5          MR. BIENENFELD:  I'm referring to a request I made

6     two weeks ago about a funeral that they still haven't

7     responded to.  I mean --

8          THE COURT:  Look, again, I can't speak to that.

9     You can always come to court if there is an issue.  Look, I

10    can't speak to what has or hasn't happened.

11         I will encourage Pretrial to obviously communicate

12    with defendant, but, again, I will -- and let me just ask

13    Felix, is there a new form that needs to be filled out or an

14    addendum, or can Pretrial work on that for the addendum?

15         MR. BIENENFELD:  Judge, would the court consider

16    him going to another house?

17         THE COURT:  Well, hang on just a second.  Let me

18    just --

19         (Pause.)

20         THE COURT:  I'm sorry.  Go ahead, counsel.  You

21    said you wanted to consider another house?

22         MR. BIENENFELD:  I wanted to consider another house

23    that he has.  Perhaps he should move into the house because

24    what's going to happen is if his wife has an emergency and

25    has to leave and he has to watch the kids, you just said he

1    can't do it.  If his wife has company over, she can't have

2    company over.

3          THE COURT:  I didn't say that, actually. I said if

4    his wife has company over he can talk to Pretrial Services.

5    I mean, you know, again, this is something where I appreciate

6    this is a bit of inconvenience, but --

7          MR. BIENENFELD:  No.  I'm --

8          THE COURT:  The alternative here, just to be really

9    blunt about this, is if he can't meet these conditions, as

10   Judge Bulsara said at the first conference, he can go to MDC,

11   right?  That is an option.

12         MR. BIENENFELD:  I'm asking how the court wants him

13   to meet conditions.  Someone knocks at the door, a friend of

14   his wife. I want to come in. I want to talk to you. I want to

15   have a cup of coffee with you.  The answer is no, you can't

16   come in?

17         THE COURT:  Yes, the answer is no, you can't come

18   in unless you talk to Pretrial Services first.  If that

19   situation arises -- and look, if that happens regularly where

20   there's a neighbor that's constantly coming by, that can be

21   addressed with Pretrial Services and that person would be

22   added to the list.

23         But at this point, given where things stand, I'm

24   not comfortable having other conditions.

25         MR. BIENENFELD:  And what if he goes outside when

1    the person's inside?

2            THE COURT:  Well, again, I'm not sure where he's

3    going exactly.

4            MR. BIENENFELD:  There's a side yard that he could

5    go to, that Pretrial Services already said he's allowed to go

6    to the side yard.

7            THE COURT:  Well, what individuals are you

8    expecting here that -- I mean, just to get ahead of this,

9    right?  I mean, are there people that are coming over that --

10   your wife has friends who constantly --

11           MR. BIENENFELD:  All day long people come over.

12   All day long there's friends come over.  All day long his

13   wife's friends come over.

14           THE COURT:  Well, what specific friends?  I mean,

15   we can add those to the list, if that's helpful.  If it's

16   your wife's friend who's coming over every day, that could be

17   added to the list for Pretrial Services.

18           MR. BIENENFELD:  It's the entire --

19           THE COURT:  I'll note in the order that he -- you

20   know, again, that there will be no visitors to the residence

21   except for the immediate family, clergy, lawyers, and I'll

22   write this out in a moment, unless pre-approved by Pretrial

23   Services or the court, or as modified by Pretrial Services.

24           If you're finding that it's the same four or five

25   people that are coming over every day, then Pretrial Services

1      I'm sure will be reasonable and assuming that there are no

2      issues, they'll just be allowed to come in.  He won't have to

3      get approval every time. But at least at this stage I'm not

4      comfortable doing otherwise.

5              So I'm just going to enter this order -- hang on. I

6      just want to write it on here so it's clear.

7          (Pause.)

8              MR. BIENENFELD:  Can my client address the court?

9              THE COURT:  Hang on just one second. I just want to

10     make sure I'm not missing anything.

11         (Pause.)

12             THE COURT:  Okay. I'm sorry. I'm sorry for the

13     delay.  Go ahead, sir.

14             MR. BIENENFELD:  I asked if my client could address

15     the court.

16             THE COURT:  Yes.  Although I will note -- I don't

17     know if counsel wants to talk about his Fifth Amendment

18     rights and the like with him or if he's been made aware of

19     them.

20             MR. BIENENFELD:  Yes, he has.  Anything you say can

21     be used against you.

22             THE COURT:  Okay.  So, again, if you want to speak

23     briefly.

24             THE DEFENDANT:  First and foremost, Your Honor,

25     thank you for seeing us today.  I --

1        THE COURT:  I'm sorry to interrupt again.  Just to

2    be really crystal clear for the record. I do note that any

3    statements -- and I know your counsel just said this, but I

4    just want to reiterate it.  Any statements that you do make

5    now, you know, could be used against you either here or in

6    another criminal proceeding. I want to make sure you're aware

7    of your Fifth Amendment rights, you're not being pressured or

8    coerced into speaking.  You don't have to speak, but if you'd

9    like to speak and if counsel's okay with him speaking, you're

10   welcome to speak.

11       THE DEFENDANT:  Thank you, Your Honor.

12       I will not address the actions in order to be able

13   to have counsel represent them on those.  All I will say is

14   this.

15       I'm trying my hardest right now to abide to every

16   single rule, to every single request that's being made. I was

17   asked to calm down, not make so many -- not send so many

18   emails.  Not to ask for so many different things and my

19   emails stopped and I haven't sent one in two weeks.

20       I've listened to every single recommendation. I

21   have never -- if looked upon on the history of my bracelet, I

22   have never been anywhere outside of route that I wasn't

23   supposed to go at any time.

24       You can search my browser history. I have never

25   once ever been on any device that I've not been approved or

1   monitored. I have never once ever done any criminal activity

2   or broke any violations, even in the allegations of the

3   Verizon store. I did not go out of my way. I go in. I merely

4   stopped along the way home in the car and waited for

5   instructions.  When I didn't get it I went home.  I never re-

6   route. I never detoured.  I never went anywhere that I wasn't

7   supposed to.

8          And there has been no proof of any criminal

9   activity whatsoever, or any violations that I have --

10   violations due to my conditions that -- I am asking you to

11   please consider for my wife, I have put her through enough

12   hell. I have put her through enough pain.

13          I'm asking for you to please consider for her to

14   monitor things as they were for a little bit longer and see

15   if it's amenable, I can agree not to go to work. It doesn't

16   affect her.

17          But the changes at home, including her not to be

18   able to go out to therapy or anything like that while -- when

19   I've got babies at home. I've never been at a risk to

20   children. It's been written in the transcripts.  Even as

21   admitted by the U.S. prosecutor on day one that I've never

22   been a risk to children ever.

23          And for my wife not to be able to go outside, or to

24   go to therapy or for us not to be able to have support in

25   these very, very trying times, for her not to be able to have

42

1    friends.  For my children not to be able to have family,

2    friends that could come over with their parents legally, I'm

3    asking please -- I'm begging you for the sake of my wife,

4    who's an innocent bystander and just five little children.

5    She's been through seven pregnancies.  We've lost two

6    children.  We've got a very busy life at home.

7         I have not violated anything with proof for sure

8    not, but I'm telling you I've not violated anything.  I'm not

9    doing anything wrong. I'm asking to please work with me,

10   please.  If there's already Adam Walsh conditions, you can

11   stop the statutory -- that's -- the lawyers will talk about

12   that.  Fine.

13        I'm asking to please not make it worse or more

14   harsh.  Give me another chance.  For the sake of my wife, for

15   the sake of my children, for the sake of my family, they will

16   not -- she will not be able to cope with this.

17        She's a young mother.  She's done nothing wrong.

18   I'm begging you to please, please see it in your heart to do

19   it for her.

20        I don't think anyone, including the government or

21   the Pretrial Services, are asking for me not to be able to

22   have any visitors or not be around my children.

23        The discussions had were whether or not we'll be

24   sending Voicenotes or whether or not we could have

25   employment.  I'll be willing not to send Voicenotes. I'll be

1    willing not to go to work physically.

2              I'm asking to please reconsider not make any

3    changes at home.  It will destroy my family.

4              THE COURT:  So this is what I'm going to do, and

5    thank you for sharing that and I appreciate that -- you know,

6    from what I gather you are trying to go through therapy and I

7    understand that.

8              I am going to set this hearing for two weeks from

9    today. I am, however, going to modify the conditions, and

10   those can be revisited at that hearing.  So this is not going

11   to necessarily be, you know, until this case is resolved.

12   This is at least until the next hearing.

13             I am going to modify the conditions. I'm going to

14   say, again, the defendant shall not have any contact or

15   association with any individual under the age of 18,

16   including his own children, except when the minor is in the

17   presence of another adult, who's the parent or legal guardian

18   of the minor.

19             Now that's the language that was in the original

20   proposed order.  The language that's been removed is that --

21   the language that has been added back in is that it's

22   including his own children.

23             I note that I'll continue Judge Bulsara's

24   condition, however, that the defendant still may communicate

25   with his children via telephone or via electronic means. So

44

1    that portion of that section does not apply.  And I'll have a

2    copy of this on the docket afterwards, just to be crystal

3    clear about it.

4         I'm going to add a 14th condition that no visitors

5    to the defendant's residence are permitted, except parents,

6    siblings, children, family members, attorneys, clergy, co-

7    workers or unless pre-approved by Pretrial Services or the

8    court, or as modified by Pretrial Services or the court.

9         I'll also add -- look, I think if there is ever a

10   doubt you should, through your counsel, contact Pretrial

11   Services. If there are issues and you're not getting

12   responses from defendant's perspective, you know, raise them

13   with the court.  Certainly, obviously, raise them in two

14   weeks at the next hearing, but otherwise I'll set this next

15   hearing to see where things are for Friday, September 20th at

16   11:00.

17        I'll also note during that time, I didn't change

18   any conditions yet with respect to, you know, the computer

19   access at work, but it does appear, based upon what

20   defendant's handed me that there seems to be some avenue

21   towards a compromise.  And I encourage defendant to work with

22   Pretrial Services and the government to try to work that out.

23        Okay.  Anything further?

24        MR. SANDLAR:  Nothing further, Your Honor.

25        MS. CARLSON:  Your Honor, could I just raise two

1       things?

2              One, I would ask if Your Honor would consider the

3       change that we requested in terms of WhatsApp, that the

4       defendant may only use WhatsApp for business purposes and

5       that he may not use Voicenotes?

6              THE COURT:  Yes, I will add that as well.

7              MR. BIENENFELD:  He --

8              THE COURT:  I apologize.  I was going to add that

9       but go ahead, defense counsel.

10             MR. BIENENFELD:  He needs WhatsApp for recovery

11      purposes.  There are recovery chats on the WhatsApp as well.

12      The reason that they use WhatsApp is because you could have

13      100 people in recovery talking about an issue.

14             And he does communicate with his children through

15      WhatsApp as well, his wife through WhatsApp.  He communicates

16      with me through WhatsApp and he communicates with his

17      synagogue through WhatsApp.

18             THE COURT:  So let me just hear -- on WhatsApp at

19      least, what's Pretrial's response on those points?

20             MS. CARLSON:  Yes, Your Honor.

21             Aside from the fact that the concerning

22      conversation that we noted earlier took place on WhatsApp,

23      WhatsApp is a bit tricky for us to monitor in terms of cyber

24      monitoring because WhatsApp is an encrypted application.  It

25      is one way encrypted, meaning that only one side of the

1    conversation is logged and reported back to monitoring

2    systems.

3            The way that our monitoring system is able to view

4    it is through screen chats, as opposed to when you text

5    message someone we receive a realtime log of those text

6    messages and exactly what was said.

7            WhatsApp -- the screen shots do not -- it's not a

8    log it's just screen shots. Those screen shots could miss

9    things here and there, which is why we try to be reasonable

10   with WhatsApp.  We understand people use it for international

11   communications or business.

12           However, when we see concerning activity on

13   WhatsApp, we do come to the court often and ask to limit it

14   because of the monitoring capabilities.

15           THE COURT:  Let me hear from the government on the

16   WhatsApp issue.

17           MR. SANDLAR:  Your Honor, we likely defer to

18   Probation's judgment. I think an exception could be made for

19   communications with counsel, although -- I'm sorry. I

20   apologize, Your Honor.  In thinking about it further, there's

21   no reason for -- why counsel can't speak to his client by

22   phone.

23           MR. BIENENFELD:  I also send documents to WhatsApp.

24           THE COURT:  Is it possible to use email instead?  I

25   mean, why does it have to be WhatsApp?  Like an encrypted --

1     MR. BIENENFELD:  I'm just saying that I use it as

2     well when I communicate with him. I can use another means if,

3     you know, if that's what you're insisting on.  That's not the

4     issue. The issue is recovery and his family as well.

5          THE COURT:  Well, again, I'm concerned about

6     allowing -- I encourage him to try to get better with his

7     situation but, you know, the statements that were made

8     earlier that this incident on August 16th was just to get

9     company, and this was someone who was in a Sexaholics

10    Anonymous and I don't want that to be an invitation to

11    suggest that well now, you know, if he's trying to get

12    recovery, he's trying to speak to people on WhatsApp and

13    suddenly now he wants them to come over or whatever, I think

14    that creates it seems like a host of other issues.

15         So let me just understand it.  So Pretrial

16    Services' request is for what exactly?

17         MS. CARLSON:  For the defendant to only use

18    WhatsApp for business employment purposes and that he not use

19    Voicenotes on any platform.

20         THE COURT:  So what if we say defendant can only

21    use WhatsApp for business and legal purposes, I guess, right,

22    if for some reason they can't go through email and not use

23    Voicenotes you said?

24         MS. CARLSON:  Yes, Your Honor.

25         MR. BIENENFELD:  He can't control who sends him a

1      message on WhatsApp.

2              THE DEFENDANT:  Your Honor, if I may?

3              THE COURT:  Well, just hold on a second here.

4              Let me hear from Pretrial.  I mean, presumably,

5      right -- well, how would you go about detecting that?  I

6      don't want to make a situation where I'm setting himself up

7      to fail on a violation either.

8              MS. CARLSON:  Yes, we understand that he can't

9      control who sends him messages on WhatsApp.  Therefore, if

10     someone were to send him a message on WhatsApp and it went

11     unresponded to by the defendant, that would not be a

12     violation of his conditions.  We would be monitoring that his

13     communications through WhatsApp are for business and legal

14     purposes only.

15             THE COURT:  Look, I think I'm going to limit the

16     defendant's use of WhatsApp for business and legal purposes.

17     I'm going to order him not to use Voicenotes.  And I'm going

18     to also order as modified by Pretrial Services.

19             If there are permutations that as you're thinking

20     about this that create really undue burdens for the

21     defendant, then that maybe could be revisited in two weeks.

22     So I'll just add number 15.

23             MR. BIENENFELD:  Your Honor, under these conditions

24     I'm going to request that he move to another house, if that's

25     possible.  Permission to be in that other house while they

1    have guests.  The house is right down the block.  If Pretrial

2    wants to visit it, they certainly can come over.  This way

3    the house could be used by his wife and visitors and he could

4    get out of house, walk down the block to another house.

5              THE COURT:  Let me hear from the government and

6    Pretrial on that.

7              MR. SANDLAR:  Your Honor, the government has no

8    objection in principle.  Our suggestion would be for Mr.

9    Bienenfeld to make an application to the court that spells

10   all this out, rather than doing it on the fly presently, that

11   provides the address of that house, that provides

12   Probations's position as it relates to the application and

13   that this all will be done in a slightly more concerted way.

14             Even during the course of the conference today

15   we've gone through multiple conditions.  Defendant has

16   elected to speak on the record and make additional requests.

17   We've added additional conditions and this creates both a

18   record that's not as clear as it may be and doesn't seem to

19   be the best way to manage the defendant's request.

20             And so in the order -- in the interest of having a

21   clear record, a clear application and clear consideration

22   from Your Honor or the duty magistrate that day, a mere

23   suggestion to place this request in detail on the record and

24   then take it up at the status conference, or before the

25   status conference on the papers as the duty magistrate may

1     deem appropriate.

2              THE COURT:  Okay.  Any thoughts from Pretrial?

3              MS. CARLSON:  Yes.  To be frank, Your Honor, we

4     would prefer that he live in a residence away from his wife

5     and children with the restriction that he may not be alone

6     with his biological children now, because there are usually

7     instances where the wife may be out of the home and have to

8     attend to other things.

9              We think it would be better suited for him to be

10    elsewhere.  However, we do agree with the government that we

11    would like some further information.

12             So we would ask if that is considered by Your Honor

13    that Pretrial be able to conduct a home assessment at this

14    new residence.

15             THE COURT:  Yes.  Look, at the conditions right

16    now, he is to maintain a residence -- or his current

17    residence, or a location approved by Pretrial Services.

18             So I think realistically if he wants to be in a

19    different home, assuming that Pretrial Services has no

20    concerns of that home, and just as Pretrial just noted, that

21    would seem to be able to resolve some of these issues.

22             I don't know if it even requires asking for any

23    further court action.

24             MR. BIENENFELD:  Well, I understand that but what I

25    was asking for actually is two homes.  So in other words, if

1   people would come to his house, he could leave, go to the

2   other house.  That's what -- the request.

3            THE COURT:  Well, I think at this point it's

4   getting a bit into the weeds and I don't want to set --

5   again, I don't want to set the defendant up for something

6   that's going to be cause him to fail.

7            I think there needs to be further discussion, as

8   Pretrial Services has already set out in the conditions.

9            I'll also ask -- and I'll put this on docket, I'll

10  also make sure this is typed into the docket in terms of

11  these new conditions, just so that there's no -- a lack of

12  clarity, just given where we are today.

13           I'll ask, Felix, if you could also make copies of

14  this order that we'll put on the docket.

15           All right. Anything further?

16           MR. BIENENFELD:  Yes. I'm going to request that it

17  be sealed as well.

18           THE COURT:  This order?

19           MR. BIENENFELD:  Everything -- the order and the

20  transcript, yes.

21           THE COURT:  I think it's -- let me hear from the

22  government on that, but what's your position?

23           MR. SANDLAR:  I don't see a basis for sealing, Your

24  Honor, nor have I had a basis for the defense's request to

25  seal it.

52

1          If there is something specific in the transcript or

2      in the order that should be sealed, then maybe that should be

3      considered, but what's the basis?

4          MR. BIENENFELD:  The basis is as follows.  There

5      people who are following this case, that are blogging about

6      it, that are putting things on Instagram and Facebook and

7      Twitter and all the other sites about it.  And they're lying,

8      quite frankly.  They're making stuff up that doesn't follow

9      what the case is about, just to shame him and to embarrass

10     him.

11         Every time something is filed, my name gets out

12     there, his name gets out there and it's a lie. I can show the

13     court a video, but I don't think you'd be inclined to watch

14     it, about somebody in front of your courthouse who came in to

15     read the transcript and go ahead and report what the

16     transcript doesn't say actually.

17         So it's embarrassing to my client. It's upsetting.

18     It also is not -- I hate that the government has a bigger

19     case and more stuff is getting leaked out and the

20     government's best interest is to keep it sealed.

21         And I believe that there are some embarrassing

22     issues leaking out in terms of recovery, in terms of

23     Sexaholics Anonymous, in terms of Alcoholics Anonymous.  And

24     for his own privacy and the privacy concern of his family I'm

25     requesting that it be sealed.

1          THE COURT:  Well, just so I understand it from the

2     government, is there anything on the docket right now that's

3     sealed? I'm not talking about redactions.  I mean, anything

4     that's sealed on the public docket?

5          MR. BIENENFELD:  Yes.

6          THE COURT:  Well, whoever -- I'll ask the

7     government first, but --

8          MR. SANDLAR:  Yes, Your Honor. I do not have the

9     docket in front of me right now, but working off of memory I

10    don't believe that there's anything sealed that is on the

11    docket.  The complaint was the only item that was sealed and

12    it was unsealed when the defendant was arrested.

13         MR. BIENENFELD:  All my requests, travel requests

14    are sealed.

15         THE COURT:  Okay.  Well, look, at this point I'm

16    not going to order sealing, but if the defense wants to make

17    a motion, that would be heard by the assigned judge here, who

18    I believe is Judge Pollak, or the assigned bench duty judge

19    that day.

20         At this point though I'm not really in a position

21    to rule on what, if anything, should be sealed, especially

22    when there is -- you know, for these cases, unless there's a

23    legal basis for it, I appreciate that there's concerns about

24    embarrassment, but at the same time the complaint is

25    unsealed, the name public.  It is a public docket.

1           MR. BIENENFELD:  Can I ask for a two week sealing

2     and write my motion?

3           THE COURT:  Well, again, this order, these

4     conditions are already unsealed.  And they've been unsealed.

5     So I am not going to now seal something at this stage. Again,

6     the defendant can revisit that if they want to file a motion.

7     But at least as it stands now, and I checked earlier today,

8     it seems like at least the documents filed by the court were

9     not under seal.

10          All right.  And, Felix, can I also have a copy also

11    of that.

12          MR. BIENENFELD:  I don't have a --

13          THE COURT:  Anything further?

14          MR. BIENENFELD:  Yes, I don't have a good copy of

15    this. I'm missing the bottom.

16          THE CLERK:  I'll email it.

17          MR. BIENENFELD:  Okay.

18          THE COURT:  Yes, and I will -- we will enter the

19    texts as well. I appreciate the -- there are those concerns

20    about sealing, but you know, we will make sure that -- if

21    there's issues with my handwriting, we'll make sure that gets

22    (indiscernible).

23          Okay.  Anything further?

24          MS. CARLSON:   One last point, Your Honor.

25          Sorry.

1           We would ask -- we would request that the court ask

2     the defendant's wife to be present for the next hearing,

3     whether that be by phone, or in person, being as she is the

4     sole surety on the bond.  Conditions were changed.  Namely,

5     the condition regarding her children.

6           THE COURT:  Yes, that's -- I agree and in reality

7     the only thing I will order is that in addition, at minimum,

8     the copy that's provided should be shared with the suretor. I

9     believe the only suretor is his wife. So that should be

10    shared with her now, tonight.

11          But certainly, she should at least be available via

12    phone, although I would just advise -- I'm not sure who's on

13    duty on September 20th, but I would just ask counsel to check

14    with Felix or the magistrate judge clerical just to see what

15    the practice is of that magistrate judge regarding having the

16    individual appear in person.

17          I think given the circumstances, particularly where

18    there's childcare issues, I would imagine there would not be

19    an issue about allowing her to appear remotely via phone, but

20    I do think she needs to hear this, given that her name is

21    signed on the bond.

22          Okay.  Anything further?

23          MR. SANDLAR:  Not from the government, Your Honor.

24          MR. BIENENFELD:  No.

25          THE COURT:  All right.  Thanks very much.

1          MR. SANDLAR:  Thank you, Your Honor.

2          THE CLERK:  Thank you.

3      (Proceedings concluded at 4:14 p.m.)

4      I, CHRISTINE FIORE, court-approved transcriber and

5  certified electronic reporter and transcriber, certify that

6  the foregoing is a correct transcript from the official

7  electronic sound recording of the proceedings in the above-

8  entitled matter.

9

10       *Christine Fiore*

11  _____        September 24, 2024

12  Christine Fiore, CERT

13      Transcriber

14

15

16

17

18

19

20

21

22

23

24